James M. Carlson (DC Bar No. 981364)
Email: CarlsonJA@sec.gov
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington DC 20549
Telephone: (202) 551-3711
Facsimile: 703-813-9314

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>    vs.<br><br>GEXCRYPTO CORP. (a/k/a GexCrypto Global Trading Corp.) and EMILIANO S. RYN,<br><br>         Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission"),

alleges as follows:

## SUMMARY

1.      Between October 2017 and July 2018, Emiliano "Emil" Ryn ("Ryn")

defrauded 26 investors out of more than $800,000 in an investment scheme primarily

targeted at elderly and technologically unsophisticated individuals in the expatriate

Filipino community in California.  Ryn presented himself as a successful Filipino

entrepreneur in the cryptocurrency space, wearing a Rolex watch and driving a

Maserati.  He positioned himself as someone who would purportedly help members

of his community also become rich through GexCrypto Corp. (a/k/a GexCrypto

Global Trading Corp.) ("GexCrypto"), a purported first-of-its kind crypto asset

trading platform, and via a purported separate crypto asset mining operation

established by Ryn.  Deceived by Ryn and his fraudulent promises of guaranteed

investment returns, investors turned over their life savings in cash to Ryn, with some

even taking out home equity loans to invest with him.

2.      The first part of Ryn's scheme involved the formation of GexCrypto,

purportedly to launch a crypto asset trading platform.  Ryn falsely represented to

investors the superiority of the GexCrypto trading platform's technology and its one-

of-a-kind customer service.  He did this through, among other ways, a professionally-

produced video available on GexCrypto's website and other statements on

GexCrypto's website.

3.      In reality, GexCrypto was never operational and the descriptions of

GexCrypto provided to investors were nothing more than Ryn's aspirations.

4.      To raise money purportedly to support and develop further GexCrypto's

trading platform, Ryn, through GexCrypto, conducted an initial coin offering ("ICO")

of GexCoins.  The ICO was advertised publicly on GexCrypto's website and social

media.  The ICO was also promoted directly by Ryn to individual investors.  Ryn and

GexCrypto made the same material misrepresentations about GexCrypto's existing

operations in marketing and advertising the ICO and guaranteed outsized returns to

investors despite the non-existent trading platform.

5.      At the same time Ryn recruited investors for GexCrypto, he offered many of those same individuals the opportunity to invest in a purported crypto asset mining business in which Ryn would pool investor funds to purchase mining equipment and pay investors returns based upon the amount of crypto assets mined ("the Mining Operation").  Several of Ryn's investors invested in GexCrypto, GexCoin, and the Mining Operation.  Ryn promised mining investors guaranteed outsized returns and repeatedly lied to investors about the mining business's operations.

6.      None of Ryn's false promises materialized.  No investment returns were ever paid, and investors lost their entire investments.

7.      As investors began to press Ryn about their promised returns and the businesses' operations, Ryn engaged in additional fraudulent lulling conduct by making additional misstatements to investors.  Among other things, Ryn:  (1) created and distributed a second worthless digital token to investors, which he falsely passed off as a GexCoin; (2) falsely told investors he was in the Philippines to register GexCrypto with the Philippine regulators; and (3) provided two investors with a fraudulent bank statement purportedly showing that payment of their promised distributions was imminent.  Ultimately, Ryn halted all communications with investors.

8.      The investments Ryn offered and sold to investors in GexCrypto, GexCoins, and the Mining Operation were securities.

COMPLAINT                                          3

9. Ryn did not register any of his offers or sales of GexCrypto or GexCoins with the Commission, no registration statement was in effect as to any offer or sale of GexCrypto or GexCoin, and no exemption from registration applied.

10. As a result of the conduct alleged in this Complaint, Defendants violated Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.

11. The Commission respectfully requests the Court enter an order: (i) permanently restraining and enjoining Defendants from violating the federal securities laws, and permanently restraining and enjoining Ryn from engaging in certain further conduct; (ii) prohibiting Ryn from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act; (iii) directing Defendants to pay on a joint and several basis disgorgement and prejudgment interest thereon; and (iv) directing Defendants to jointly and severally pay a civil money penalty.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C.

§§ 78(u)(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

13.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants GexCrypto and Ryn operated or resided in this district during the conduct.

## **DEFENDANTS**

14.     GexCrypto Corp. (a/k/a GexCrypto Global Trading Corp.) ("GexCrypto") is an entity, founded in 2017 and controlled by Ryn, which did business in Orange County, California, and purported to be "a comprehensive Cryptocurrency trading platform backed by the world's first fully incorporated concierge service."  GexCrypto Global Trading Corp. was registered in Nevis from September 28, 2017 through February 4, 2020, but is not currently registered in any jurisdiction.  GexCrypto does not appear ever to have held any bank accounts, property, or assets in its own name.  GexCrypto has never been registered with the Commission in any capacity nor ever had a class of securities registered with the Commission.

15.    Emiliano S. Ryn, ("Ryn"), 47, currently resides in Las Vegas, Nevada. During the relevant period in 2017 and early 2018, Ryn resided in Irvine, California. Ryn founded GexCrypto in 2017, served as its Chief Executive Officer, controlling all aspects of its business.  Ryn also founded and controlled the Mining Operation.

## STATEMENT OF FACTS

I.    **Background Facts**

A.    **Ryn Creates GexCrypto**

16.    In 2017, Ryn founded GexCrypto in order to purportedly to develop a crypto asset trading platform and create and distribute a digital token.

17.    Ryn hired an individual online to register GexCrypto in Saint Kitts & Nevis and obtained blank GexCrypto stock certificates.

18.    In the summer of 2017, Ryn found two freelance developers based in India and hired them to create GexCrypto's trading platform.  The developers, as Ryn knew, had no experience building a crypto asset trading platform.

19.    As a first step, at Ryn's direction, the developers created a website for GexCrypto—www.gexcrypto.io—to advertise the trading platform's capabilities and GexCrypto's subsequent ICO of GexCoins.  Ryn reviewed and approved the content of GexCrypto's website, which was available to the public worldwide without restriction, including to U.S. investors.

20.    GexCrypto's website described GexCrypto as the first-of-its-kind crypto asset trading platform, including as:

i. "a comprehensive Cryptocurrency trading platform backed by the world's first fully incorporated concierge service";

ii. "the most advanced Cryptocurrency trading platform powered by the most trusted, reliable and experienced technical team."; and

iii. "hav[ing] an un-matched understanding of the Cryptocurrency market as well as the global distribution of Cryptocurrency."

21.    In describing what set GexCrypto apart from other currency trading platforms, the website stated that:

i. "We have diligently studied emerging international regulations and changing economic scenes which affect the various aspects of Cryptocurrency in the marketplace."

ii. "The Cryptocurrency world is undergoing continuous change. There are countless important developments happening in numerous countries regarding regulating, controlling and structuring the cryptocurrency market. Here at GexC we guarantee that we will continuously stay in front of all global developments related to the Cryptocurrency market."

22.    The website also distinguished GexCrypto from other currency trading platforms based upon GexCrypto's "superior market analysis tools to ensure our users' success" and "[s]uperior [r]esources and [p]ractices to [d]eliver [s]uperior [t]echnology and [s]ervice."

23.    According to the website, GexCrypto's "superior resources" included "multi-language technical support" and a "technical team."

24.    The website described the superior multi-language technical support as follows:  "We speak the languages of our customers. We currently offer multi-lingual 24/7/365 user support in six languages: English, Japanese, Mandarin, Korean,

Spanish, Russian and Hindi. As our user base grows we will be adding to this list to ensure all of our users' questions or concerns can be addressed."

25.     The website described the superior technical team as "the world's best developers, coders and mathematicians who have diverse experiences in all niches related to DLTs and cryptography."

26.     The website identified GexCrypto's "trusted, reliable, and experienced" leadership team to include Ryn and three additional "co-founders": the two India-based developers Ryn had hired online, who were identified as the "CTO" and "Director of Operation," and a third individual, the owner of a construction business, who had made an early investment in GexCrypto.

27.     The website identified GexCrypto's Board to include a head of "PR & Communications."  This individual, whose background was in engineering, asked Ryn why he was listed as head of PR when he had no experience and was not performing that role.  Ryn told him not to worry.

28.     The GexCrypto website also contained a link to a promotional YouTube video about GexCrypto, which Ryn had hired a videographer to produce.  In the video, actors discussed the revolutionary nature of blockchain technology and GexCrypto's role in it.  The video repeated many of the same claims as on GexCrypto's website about its superior technology and services.

29.     For example, one actor described GexCrypto as "the most advanced cryptocurrency trading platform" and "totally unique from the rest of the market."

The actor further articulated what set GexCrypto apart: "Most of the trading platforms over the internet offer either coin or platform, but we offer a blend of both. Yes, coin and trading platform under one single roof. Secondly, we offer the world's first fully implemented user service."

30.    Along with the actors, Ryn appeared in a segment of his own in the video. In Ryn's segment, he highlighted the expertise of GexCrypto's management: "We all have been a part of the crypto community since its inception and are successful entrepreneurs in several different market segments. We have more than 50 years of experience in management, risk analysis, compliance, and empower other users of new underlying technology such as blockchain." Ryn also emphasized GexCrypto's "one hundred percent unique, innovative, and technically superior" trading platform and GexCrypto's mission "to deliver the highest possible level of service to our users," as well as "demonstrate[ing] an invincible technology leadership that will undoubtedly make GexCrypto an unsurpassed leader in the world of ecurrency," that may "unite the entire globe under one comprehensive trading platform."

31.    The video further portrayed GexCrypto's purported "world's first fully implemented concierge service" by showing a call bank of personnel answering telephone calls.

### B.    Ryn Conducts an ICO of GexCoins

32.    In late 2017 and early 2018, Ryn created and sold GexCoin, a digital

token issued by GexCrypto. As described throughout this Complaint, Ryn and GexCrypto pooled the funds raised from investors from the offers and sales of GexCoin in a common enterprise to build GexCrypto's trading platform, and investors had a reasonable expectation of profits based on the efforts of GexCrypto's management and technical team.

33. GexCrypto solicited investors in a so-called "Initial Coin Offering" or "ICO" via GexCrypto's social media accounts and website, including through a White Paper published in or around November 2017 on GexCrypto's website. Ryn also personally solicited individual investors as described more fully below. Ryn's and GexCrypto's solicitation of investors for the ICO was specifically directed at U.S. investors.

34. As with GexCrypto's website, the White Paper presented GexCrypto as a fully-operational trading platform. For example, the White Paper described GexCrypto as "offer[ing] benefits and returns, above and beyond any other exchange currently available" and that "[t]he Gex platform caters to both new and seasoned traders with proprietary guided assistance tools to help users make educated investment decisions."

35. Similarly, the White Paper described the existing security features that the GexCrypto trading platform offered, including: (i) "two-factor authentication;" (ii) "advanced verification software that maintains and monitors the integrity of the account;" and (iii) "withdrawal protection," which "makes the withdrawal process

completely protected from unauthorized accesses."

36.    The White Paper also highlighted GexCrypto's management and technical team as "the most trusted, reliable and experienced crypto veterans," who "have been part of the Cryptocurrency community since its inception," and have a "deep understanding of the cryptocurrency market and its distribution worldwide."

37.    The terms of the GexCoin ICO were described on GexCrypto's website and in the White Paper.  According to the White Paper, 50 million GexCoins were to be issued in the ICO's pre-sale phase and 290 million GexCoins in the ICO phase. During the pre-sale stage (November 11, 2017 – December 10, 2017), investors could invest in GexCoins at a discounted price.  If investors invested in the ICO before November 14, 2017, they also would receive "30% extra coin."  After the pre-sale, investors could still purchase GexCoins, but at a higher price (during the pre-sale, 1 Bitcoin purchased 50,000 GexCoin, whereas afterward, 1 Bitcoin purchased 40,000 GexCoin).

38.    The White Paper explained the returns that investors in the ICO would make as follows:  "[b]y taking part in the campaign (pre-ICO/ICO) participants will receive an 8% return (after all relative fees and expenses are deducted) of the total trading revenue generated over a 24-hour span."  The White Paper further explained mechanically how investors were to be paid their returns as follows:  "The funds (in the form of GexCoin) will be distributed to the investors' wallet via smart contract upon the completion of every 24-hour period."

39.     The White Paper also represented that upon completion of the ICO, GexCoins would be "listed on four leading trading platforms."

40.     The GexCrypto website contained the following disclaimer:  "While most participants of any citizenship can join the ICO, unfortunately we are unable to accept participation from citizens or residents of the United States, Canada, China, and Taiwan due to existing regulations in their respective countries."  However, GexCrypto's website was not restricted in any way and was accessible to U.S. investors.  Further, Ryn's and GexCrypto's solicitation of investors in GexCrypto and the ICO was specifically targeted to U.S. investors, as described below.

41.     In addition to being advertised on the GexCrypto website, the ICO was advertised and promoted on Facebook, Twitter, Bitcointalk, and other social media platforms.  In order to generate additional interest in the ICO, GexCrypto hired a group of online promoters via a Bitcointalk "bounty campaign," paying them in GexCoin to hype the GexCrypto ICO via their own social media channels multiple times each day.  As a limited-time promotion, investors who signed up on the gexcrypto.io website or who joined the GexCrypto Telegram group were also offered free GexCoins.

## II.     Ryn Solicits Individual Investors for GexCrypto from the Filipino Community

42.     In addition to GexCrypto's online solicitations, from approximately October 27, 2017 through December 26, 2017, Ryn also directly solicited and

recruited individual U.S. investors for GexCrypto and GexCoins through in person meetings and via Skype and telephone calls.  During these solicitations, Ryn also directed investors to the GexCrypto website.

43.     As part of these solicitations, Ryn hosted and attended meetings around Orange County, California.  As part of his efforts to portray GexCrypto as a successful operational business, Ryn handed out GexCrypto branded merchandise.

44.     At these meetings to promote GexCrypto and the ICO, Ryn walked through the proposed project, how to invest, and the discounts available for early investing.  During these meetings, Ryn consistently touted the profitability and safety of investing in GexCrypto and GexCoins.

45.     Ryn gained entrée to this group of investors through his initial contact with Investors 1 and 2, who Ryn met in October 2017 at a "meet up" event in Irvine, California for people interested in cryptocurrency.  Investor 1 wanted to supplement his retirement income so that he was not dependent on social security.  Investor 2 was a home health aide who was seeking financial stability and to build a college fund for her children. Investors 1 and 2, who are also Filipino, went to dinner with Ryn where they discussed their multilevel marketing business for investing in cryptocurrency, and Ryn told them about GexCrypto.  Despite their involvement in the multilevel marketing business, Investors 1 and 2 had no background in cryptocurrency or digital technology.

46.     Following this meeting, Investors 1 and 2 introduced Ryn to friends and

acquaintances in the Filipino community, who, like them, ultimately invested in GexCrypto.  These investors included Investor 3—Investor 1's daughter—Investor 4—the godmother to Investor 2's daughter—and a number of retirees.

47.     In one meeting at Investor 2's apartment on or around October 27, 2017, Ryn pitched the investment to Investor 4 and Investor 5, both of whom were looking for stable income for retirement.   Investor 4 understood from Ryn that if she invested, she would earn a percentage of profits from trading and mining of cryptocurrency.  She further understood that if she invested early, she would get "a lot" of extra tokens.

48.     Based on Ryn's representations at the meeting on or around October 27, 2017, both Investor 4 and Investor 5 decided to invest.  Investor 4 invested $9,000 in cash, which she borrowed from her credit union, and Investor 5 invested $10,000 in cash, which he had from the sale of a home in the Philippines. Both investments were recorded by hand, as well as those of other investors, on a hand-written "GexCrypto" ledger provided by Ryn and safeguarded by Investor 2.

49.     During these meetings with prospective investors, Ryn touted the profitability and safety of investing in GexCrypto, telling potential investors that their investments would double or triple in a short period of time.  For example, Investors 4 and 5, both understood after the meeting on or around October 27, 2017, that their investments would multiply in a few months and that Ryn would return their entire investment.  Following her investment, Investor 4 texted with Ryn about GexCrypto,

writing to Ryn on November 7, 2017 "Praying to God the GEX will Prosper" with Ryn responding the same day "It will for sure sis" (translated from Tagalog).

50.     In late October 2017, Ryn met via a video chat with Investor 6, a retiree looking for a steady and reliable investment to enhance her retirement funds, and Investor 7, a retiree also looking to supplement her retirement income, to discuss investing in GexCrypto.  Again, Ryn touted the profitability and safety of investing in GexCrypto.  Ryn stated that GexCrypto tokens were currently worth $0.06 and that as the price of the tokens increased, so would the investors' returns.  Ryn also told Investors 6 and 7 that if they invested prior to the deadline in mid-November 2017, they would get an extra 30% bonus in tokens on their investment.  Ryn further told Investor 6 she would be rich and could buy a car since her car was always breaking down.  Based upon Ryn's representations and in order to receive bonus tokens, in early November 2017, Investor 6 invested $7,000 in cash in GexCrypto and Investor 7 invested $6,170 in cash and Bitcoin in GexCrypto.

51.     Ryn also promised certain investors stock in GexCrypto, although such stock certificates were never issued.  On October 15, 2017 and October 29, 2017, Ryn sent Investors 2 and 6, respectively, a copy of what a GexCrypto stock certificate purportedly looked like.  The undated, unsigned certificate identified GexCrypto Trading Corp. as incorporated under the laws of Nevis and authorized to issue 1,000 shares registered stock.

52.     Ryn only accepted investments in cash or crypto assets, telling investors

that ICOs can only be invested in via cash or crypto assets.  The majority of investors

solicited in person paid Ryn in cash.  Ryn raised just over $371,000 in cash and 2

Bitcoins from 25 GexCrypto and GexCoin investors.

### III.   <u>**Material Misrepresentations to GexCrypto Investors**</u>

53.    As described above, Ryn and GexCrypto made materially false

representations to investors online via the website and the White Paper and in-person

to individual investors about the operations of GexCrypto, GexCrypto's experienced

management team, and GexCrypto's guaranteed returns.

54.    Ryn and GexCrypto knew or were reckless in not knowing that these

misrepresentations were false.

55.    Despite portraying GexCrypto as an operational, world-class trading

platform with superior service and technology, the GexCrypto platform was never

built and was never operational.  Accordingly, it had none of the features described in

detail on the website, in the White Paper, in the YouTube video, and by Ryn, such as

user-support in six languages and enhanced security features.

56.    GexCrypto's expert team of "the most trusted, reliable and experienced

crypto veterans" as described in GexCrypto's White Paper and portrayed on

GexCrypto's website did not exist.  As described above, GexCrypto's purported

"CTO" (Chief Technology Officer) and GexCrypto's purported "Director of

Operation" were the two India-based developers Ryn met and hired online.  Ryn's

purported GexCrypto "co-founder," the owner of a construction business, was merely

an early investor who also had no experience in the crypto industry.

57.     Ryn admitted in SEC testimony that the trading platform never existed and that the depictions in the YouTube video on GexCrypto's website were false, but that the video was published on GexCrypto's website because he thought it "look[ed] kind of cool."

58.     Ryn's promises to investors of profits from the trading business, including representations in the White Paper that investors would receive an "8% return [ ] of the total trading revenue generated over a 24-hour span" and representations to individual investors that their investments would double or triple, were false.  The trading platform did not exist.

## IV.   The Crypto Asset Mining Investment

59.     At the same time Ryn was pitching his fake trading platform to investors, he offered the same group of Filipino investors another prospect to make money by investing in a purported crypto asset mining business ("the Mining Operation").  Ryn told investors that he would pool their money to purchase mining equipment, and they would be paid investment returns based upon the amount of Ethereum mined.

60.     Before a technological change in the Fall of 2022, the "ethereum" block chain validated new blocks or transactions via a process known as "Mining," whereby computers connected to the network could attempt to solve complex computational problems required to validate a new block, in exchange for rewards in

the form of "Eth," the crypto asset that is the "native token" to the Ethereum blockchain.  This process, known as "mining," requires significant computational power, including potentially significant electrical power

61.     The investments in the purported crypto asset mining business were investment contracts and therefore securities.

62.     Investor 1, now deceased, was particularly interested in learning more about cryptocurrency and how to make money in the crypto world.  Beginning in November 2017, Ryn and Investor 1 began discussing, including through text messages, the potential mining business and the computer equipment needed to run the mining business, as well as the need for investors to fund this potential mining business.  For example, on November 20, 2017, Ryn texted Investor 1: "Elder brother, let's push for the big investors. Ethereum is about to take off" (partially translated from Tagalog).

63.     After searching for several weeks for locations to house the Mining Operation, it was ultimately decided to set up the operation in Investor 1's garage.  Although housed at Investor 1's home, Ryn oversaw all aspects of the Mining Operation, including, collecting investor funds, purchasing the equipment, instructing Investor 1 regarding the equipment, and responding to Investor 1's frequent texts with questions about how to operate the machines.  Similarly, in March 2018, after Investor 1 passed away, Ryn instructed Investor 1's daughter – Investor 3 – how to operate the machines.  All investors in the Mining Operation relied entirely on Ryn's

efforts for the enterprise to succeed, and Investors 1 and 3 acted solely at Ryn's direction.

64.    Ryn recruited investors for the Mining Operation through in-person meetings, telephone calls and text messages.

65.    For example, on November 20, 2017, Ryn texted Investor 6, writing "Are you familiar with mining ma'am?" (translated from Tagalog).  She responded "not yet" (translated from Tagalog), and he followed up by sending her images of mining equipment.

66.    During a video chat with Investors 6 and 7 in November 2017, Ryn pitched the mining investment in more detail.  Ryn told them that if they invested with him, he would use their money to buy crypto mining equipment and that the investment provided a guaranteed return, since the mining happens around the clock. Ryn declared that the minimum investment was $100,000, and he promised that their monthly returns would be $10K, $15K, $20K or even $50K, a promise Ryn repeated to other investors.  Investor 6 understood from the conversation with Ryn that she would be able to withdraw her original investment after three months and leave the profits with Ryn, which he would use to buy more equipment.  Ryn told her the additional equipment would increase both the mining capacity and her future returns.

67.    Ryn's promises of guaranteed returns to investors in the Mining Operation were false.  By mid-December, Ryn had purchased some crypto mining equipment, but only some of it was operational.  Moreover, the business was not

generating the profits that Ryn was promising to investors – a minimum of $10,000 per month.  No profits were ever distributed to investors.

68.     Ryn again only accepted cash from investors for the Mining Operation, some of whom were in Northern California.  As a result, on multiple occasions Ryn drove from Irvine to San Francisco to pick up large amounts of cash from investors, including on January 6, 2018, when he collected $48,000 in cash from Investor 7 and in a trip on or around February 22 – February 24, 2018, Ryn collected an additional $100,000 in cash from Investor 6.  Upon Investor 7's insistence, Ryn signed a receipt acknowledging the $48,000 investment.

69.     Ryn showed up to pick up Investor 6's payment in February 2018 in his Maserati, allowing Investor 6 and other investors to take pictures of themselves with the car.  Ryn sent copies of these photos to various investors.

70.     Ryn raised at least $448,500 from seven investors for the Mining Operation.  Investor 1 took out a $200,000 home equity loan and sold property in the Philippines in order to invest in the Mining Operation.  Investor 2 used the funds she was saving for her children's college education to invest $100,000.  When Investor 5 told Ryn he had no more money to invest in the Mining Operation, Ryn tried to convince him to hand over the deed to a property he owned in the Philippines.  Investor 6 took out a $90,000 home equity loan in order to make a $100,000 investment in the Mining Operation. Investor 7 withdrew $48,000 from her 401K to invest in the Mining Operation.

71.     At the same time that Ryn was obtaining money from investors in cash for GexCrypto, GexCoins and the Mining Operation, he made several large purchases of luxury items in cash, including a $52,000 Maserati in November 2017, a vacation to Hawaii with his family in December 2017, and a $7,000 Rolex watch in March 2018.

72.     After obtaining money from the Mining Operation investors, Ryn engaged in lulling conduct by making multiple additional material misrepresentations to investors regarding the business.  These include Ryn telling investors he:  (1) was moving the mining business to Las Vegas because of lower electricity costs; (2) had been visiting and researching locations in Las Vegas, including a solar farm; and (3) had ultimately secured a warehouse in Las Vegas for the Mining Operation.  These statements regarding moving the Mining Operation to Las Vegas were false – Ryn did not visit any locations in search of a location and never secured a space in Las Vegas.

73.     Ryn knowingly or recklessly made these material misrepresentations to investors.

**V.    Defendants' Continued Deception and Misrepresentations**

74.     When none of the promised returns for GexCrypto and the Mining Operation materialized, investors began pressing Ryn for information regarding their investments.

75.     In order to keep the fraud from being exposed, Ryn knowingly or

recklessly engaged in additional deception and lies.  These include:  (1) creating and distributing a worthless new digital coin to investors that Ryn passed off as a GexCoin; (2) telling investors he was traveling to the Philippines to meet with Filipino regulators about GexCrypto; and (3) providing a fraudulent bank statement to two investors as proof that their promised investment distribution was forthcoming.

**A.**     **<u>Ryn Provided Alternative, Worthless Tokens</u>**

76.     In the spring of 2018, as investors repeatedly questioned Ryn for updates regarding their investments, and with no promised returns to pay investors from either GexCrypto or the Mining Operation, Ryn created a second token "GeXCHANGE."

77.     GeXCHANGE is a unique digital token existing on a separate smart contract than GexCoin.  Ryn learned how to make the tokens from searching the internet for how to create a digital token days before distributing the coins to investors.

78.     Despite the fact that the GeXCHANGE token was a completely different token than the GexCoin, Ryn passed the GeXCHANGE token off as the GexCoin, including that the GeXCHANGE tokens were investors' promised distributions from GexCrypto and the Mining Operation and that the GeXCHANGE tokens had the same value as the GexCoin.

79.     Ryn made a large distribution of the GeXCHANGE tokens to Investor 3, who distributed them to the other investors following Ryn's instructions.

80.    For example, on April 18, 2018, Ryn texted Investor 3 with instructions regarding how to distribute the GeXCHANGE tokens to investors and how many tokens each investor should receive based upon the amount of their investments in GexCrypto and the Mining Operation.  Ryn never told Investor 3 that the tokens he was directing her to distribute to investors were not GexCoins, but GeXCHANGE tokens instead.

81.    On April 19, 2018, Ryn distributed 20,000 GeXCHANGE tokens to Investor 6's cryptocurrency wallet and informed Investor 6 that it had been done. Ryn never told Investor 6 that the 20,000 tokens he distributed were GeXCHANGE tokens and not GexCoins.

82.    Ryn continued distributing and having the GeXCHANGE tokens distributed, over 8.5 million GeXCHANGE tokens, to investors into at least June 2018 without informing them that they were not GexCoins.

83.    Ryn made representations earlier to investors regarding the value of the GexCoin, including, for example to Investor 6 on April 16, 2018 that 1,000 GexCoin were worth "$110 right now. 300,000 gex equals $33k," and to other investors that the GexCoin was worth $0.11, when distributing the GeXCHANGE tokens to investors.  These statements were materially misleading as Ryn never informed them that those purported values did not apply to the GeXCHANGE tokens, because it was not the same token.

**B.**   **Ryn's Fake Trip to the Philippines**

84.    In the spring of 2018, as investors continued to press Ryn for updates regarding their investments, Ryn told investors that he was traveling to the Philippines to discuss registering the trading platform with the Central Bank of Philippines and the Filipino securities regulators.

85.    For example, on May 3, 2018, Ryn texted Investor 6, writing "I will be in the Philippines next week for gexcrypto to talk to the SEC for the exchange" (translated from Tagalog).  Ryn further explained in the same text message chain with Investor 6 that there would not be any distributions from the Mining Operation that month because the operation would be delayed while he was in the Philippines.

86.    Similarly, on May 2, 2018, Ryn texted Investor 4, "Going to Philippines next -week to talk with security and exchange commission then central bank of philippines to present the trading platform. This very good news for all of us."  In a May 8, 2018 text message told Investor 4 that he was on a "4 pm flight [out of] John Wayne airport" and flying "United to Hawaii then Hawaii airline to Manila."

87.    Later in May, when investors reach out for updates, in response, they received texts purportedly from Ryn's son that his father has been hospitalized in Manila and would not be home until the following week.

88.    Ryn's statements to investors regarding his trip to the Philippines and his meetings with Filipino regulators about GexCrypto were false, which Ryn admitted in SEC testimony.  Ryn also admitted in testimony that he does not even have a valid

passport to travel abroad.

### C.     Ryn Falsified a Bank Statement
### and Provided It to Certain Investors

89.     Ryn's deceit to investors culminated in his creating and distributing a fraudulent bank statement to two investors, Investors 6 and 7, to try to convince them that after repeated delays in payment, the investors' distribution of profits was on the way.

90.     Upon request from Ryn and in order for Ryn to make her and Investor 7's promised, but yet unpaid, monthly mining distribution, on July 4, 2018, Investor 6 provided Ryn via text with bank account information for her and Investor 7.  The next day, Ryn replied to Investors 6 and 7 that he had received the bank information and the distribution was coming "tomorrow."

91.     After not receiving the distribution as promised, Investor 6 continued to press Ryn as to where it was.  In response, on July 7, 2018, Ryn texted Investor 6 that the distribution would be made on Monday, July 9, 2018 around noon.   When the distribution still had not been made by that date, Investor 6 again followed up with Ryn.  Ryn initially told Investor 6 via text on July 9, 2018 that he would make the deposit later that day.  However, later that day, Ryn informed Investor 6 that he could not make the deposit because "Ma'am Chase doesn't accept non customer deposit. They don't allow. You can call your bank to verify it. I have Citibank" (partially translated from Tagalog).  Ryn informed Investor 6 that the following day, he would

open a Chase bank account and make the deposit.

92.     Ryn's representation to Investor 6 that he had a bank account at Citibank was false.  At the time, Ryn did not have any bank accounts because of his history of bouncing checks.  However, Ryn had access to his son's bank account at Chase.  Ryn put that access to use, emailing to himself on July 10, 2018, a copy of a recent bank statement from his son's Chase bank account.  The account statement showed that the account was overdrawn by $161.47.

93.     That day, Ryn altered the same bank statement in order to reflect that (i) he was the account holder; (ii) the address on the account was his previous address in California, rather than his current one in Las Vegas where he was living with his son and other family members; and (iii) a pending deposit of $125,000.

94.     Later on July 10, 2018, Ryn sent an image of the fraudulent bank statement via text to Investor 6, telling her that once the $125,000 deposit cleared he would make an online transfer to her and Investor 7.

95.     When the promised online transfer did not occur, Investor 6 again followed up with Ryn via texts on July 11 and July 15, asking when the transfer would be completed. Ryn repeated his lies, telling Investor 6 "Don't you worry.  It should be good tomorrow" (translated from Tagalog).

96.     In an additional lie to Investors 6 and 7 about the promised payment, on July 16, 2018, Ryn texted them to say that the transfer "was done [at] midnight," (translated from Tagalog) and to thank them for waiting.

97.     No transfer was ever made to Investors 6 and 7.  Neither Investors 6 and 7 nor any of the other investors received any distribution of profits from their investments in either the Mining Operation or GexCrypto.

## VI.     The GexCrypto, GexCoin, and Mining Operation Investments Were Securities

98.     The investments in GexCrypto, GexCoin, and the Mining Operation were investment contracts and therefore securities, the offer or sale of which was not registered with the Commission, as required by the federal securities laws.  Neither the GexCrypto nor GexCoin securities were exempt from registration.

99.     GexCrypto and GexCoin investors tendered cash and crypto assets into a common enterprise, with the reasonable expectation that they would receive a profit based upon Ryn's and the GexCrypto team's running of a successful crypto asset trading platform and based upon Ryn's overseeing of a successful mining operation. Investments in GexCrypto, including through the purchase of GexCoins—which embodied the investment opportunity into GexCrypto's trading platform business and as such were offered and sold as investment contracts and therefore securities as that term is defined under Section 2(a)(1) of the 33 Act—were repeatedly described and marketed as "investments."  Investments in the Mining Operation were similarly marketed as an opportunity to profit from Ryn's oversight of the Mining Operation which included Ryn's pooling of investor funds for the purchase of mining equipment, and distributing profits to investors to investors based upon the amount of

1   ETH successfully mined.

2       100.   The GexCrypto and GexCoin investment offerings did not qualify for

3   any exemption to the securities registration requirements, and neither Ryn nor

4

5   GexCrypto sought any such exemption.

6                              **COUNT I**

7   **Unregistered Offers and Sales of Securities in Violation of Sections 5(a) and 5(c)**
8                        **of the Securities Act**

9       101.   The SEC realleges and incorporates by reference paragraphs 1 through

10  100, inclusive, as if they were fully set forth herein.

11

12      102.   As a result of the conduct alleged herein, Defendants GexCrypto and

13  Ryn directly or indirectly, made use of the means or instruments of transportation or

14

15  communication in interstate commerce or of the mails, to offer to sell or to sell

16  securities, or to carry or cause such securities to be carried through the mails or in

17
    interstate commerce for the purpose of sale of delivery after sale.
18

19      103.   No valid registration statement has been filed with the Commission or

20  has been in effect with respect to any offering or sale alleged herein. There was no

21
    exemption applicable for the offer and sale of the GexCrypto or GexCoin securities
22

23  from the registration requirements of the Securities Act.

24      104.   By engaging in the foregoing conduct, GexCrypto and Ryn violated, and

25
    unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the
26

27  Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

28

## COUNT II

### Fraud in Violation of Section 17(a) of the Securities Act

105.   The SEC realleges and incorporates by reference paragraphs 1 through 100, inclusive, as if they were fully set forth herein.

106.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

107.   By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## COUNT III

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5

108.   The SEC realleges and incorporates by reference paragraphs 1 through 100, inclusive, as if they were fully set forth herein.

109.   By engaging in the conduct described above, Defendants, and each of

them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

110.   By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find that Defendants committed the violations charged and that, as a result of these violations, Defendants received ill-gotten gains; and enter judgments:

## I.

## Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining

Defendant Ryn, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them, from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## II.

### Disgorgement

Ordering Defendants to disgorge on a joint and several basis, with prejudgment interest, the net profits they received from their ill-gotten gains as a result of the acts or courses of conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(7)].

## III.

### Penalties

Ordering Defendants to pay on a joint and several basis civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

### Officer and Director Bar

Prohibiting Defendant Ryn from acting as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of

COMPLAINT                                     31

the Exchange Act [15 U.S.C § 78l] or that is required to file reports pursuant to

Section 15(d) of the Exchange Act [15 U.S.C § 78o(d)], pursuant to Section 20(e) of

the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15

U.S.C § 78u(d)(2)].]; and

## V.
## Further Relief

Granting such other and further relief as the Court determines to be necessary

and appropriate.

## VI.
## Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over

this action and over Defendants in order to implement and carry out the terms of all

orders and decrees that may hereby be entered, or to entertain any suitable application

or motion by the Commission for additional relief within the jurisdiction of this

Court.

Dated:  February 6, 2023                    Respectfully submitted,


                                            /s/  James M. Carlson
                                            JAMES M. CARLSON
                                            Supervisory Trial Counsel
                                            (DC Bar No. 981364)
                                            Securities and Exchange Commission
                                            100 F. Street, NE
                                            Washington, DC  20549
                                            Tel: 202-551-3711
                                            Fax: 703-813-9314

COMPLAINT                                   32

Email:  CarlsonJA@sec.gov

*Counsel for Plaintiff Securities and*
*Exchange Commission*